## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **PETMAS INVESTORS LTD,** | Civil Action No. 13-6807 (FLW)(LHG) |
| Plaintiff, | |
| v. | |
| **SAMEIET HOLBERGS GATE 19,** *et al.*, | **REPORT & RECOMMENDATION** |
| Defendants. | |

This matter is opened to the Court by way of the Complaint filed by Plaintiff ("Complaint" or "Compl.") [Docket Entry No. 1], as well as the Court's November 19, 2013 Order to Show Cause [Docket Entry No. 4] as to the bases pursuant to which this Court may exercise jurisdiction over the Complaint, by which Plaintiff Petmas Investors LTD ("Plaintiff") asks the Court to (1) quash the summons served upon Plaintiff with regard to an action pending in the Oslo District Court in the Kingdom of Norway ("the Norway Action") or (2) dismiss the pending complaint in the Norway Action [Docket Entry No. 1]. Plaintiff submitted the Supplemental Brief of Plaintiff in Support of Order to Show Cause on November 25, 2013 (the "Supplemental Brief" or "Pl.'s Br."). [Docket Entry No. 10]. For the reasons set forth below, the undersigned concludes that this Court lacks jurisdiction over this matter and therefore respectfully recommends that the Complaint be dismissed.

I.       Background

As best can be gleaned from the Complaint, Defendants Sameiet Holbergs Gate 19, Ophelia Bar Gino Alickaj, Hammervoll Holding A.S., Gilbo Holdings A.S., and Anceca A.S.

1

(collectively "Defendants") operate businesses located at Holbergs Gate 19, 0166 Oslo, Norway.[1] Compl. § I, ¶¶ 2 - 5 [Docket Entry No. 1-1].  During the summer of 2008, renovations to a unit on the third floor of the Holbergs Gate property damaged Defendants' units.  *Id.* § V, ¶ 6.  Plaintiff alleges that it purchased the unit in October 2008, after completion of the renovations.  *Id.* § V, ¶ 6.  Defendants initiated the Norway Action against Plaintiff in October 2012, seeking compensation for damages they allegedly incurred as a result of the renovations.  *Id.* Introduction ¶ 2; Exh. B (Writ of Summons and Particulars of Case to Oslo District Court, dated October 11, 2012) [Docket Entry No. 1-2 at pp. 12-16].  On March 6, 2013, the Oslo District Court issued a summons advising Plaintiff that a November 19, 2013 trial date had been set for the Norway Action.  *Id.* Introduction ¶ 2; Exh. B (Summons to main hearing in a civil case) [Docket Entry No. 1-2 at p. 11].[2]  Shortly thereafter, the Oslo District Court ordered Plaintiff to respond to the Norway Action complaint within 21 days or risk the entry of a default judgment.  *Id.*, Exh. B (Order to give notice of intention to defend) [Docket Entry No. 1-2 at pp. 9-10].  Defendants served Plaintiff with the Complaint in the Norway Action on May 7, 2013.  *Id.* Introduction, ¶ 1.

Plaintiff alleges that Defendants' service did not comply with the formalities of both the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 (the "Hague Service Convention" or the "Convention"), and the Federal Rules of Civil Procedure.  Compl. Introduction ¶ 1; § IV, ¶ 2. Plaintiff's attempts to argue defective service before the Norwegian judge were unsuccessful.  *Id.*

---

[1] The Court presumes, solely for the purposes of this Report & Recommendation and without making any factual determinations, that the facts presented by Plaintiff in the Complaint are true.

[2] The Complaint states that the summons reflects a trial date of March 18, 2013.  Counsel for Plaintiff recently advised that the trial still has not taken place.

§ VI, ¶2; § VII, ¶ 5; Affirmation of Geir Ostgard in Support of Plaintiff/Petitioner's Request for Relief ¶¶ 3, 4, 6, 9  ("Ostgard Affirmation") (attached to the Complaint as Exhibit G) [Docket Entry No. 1-3 at pp. 3-8].  As a result, Plaintiff filed the Complaint on November 8, 2013, seeking (1) a declaration that the May 7, 2013 service was fatally defective; (2) either a temporary or permanent injunction enjoining Defendants from giving any effect to the allegedly defective service; (3) an order quashing the service or dismissing the Norway Action; and (4) the costs associated with the filing and a monetary sanction "in light of the attitude of Defendants."  Compl. § 8.  Plaintiff attached the Ostgard Affirmation as well as the Affirmation of William George ("George Affirmation") (attached to the Complaint as Exhibit H) [Docket Entry No. 1-3 at pp. 9-13] in support of the application to dismiss or quash the complaint in the Norway Action.

By Order dated November 19, 2013, the undersigned required Plaintiff to show cause as to the bases for this Court's jurisdiction to quash foreign service that purports to have been made appropriately upon Plaintiff or to dismiss the complaint in the Norway Action.  [Docket Entry No. 4].  Following receipt of a facsimile letter from Plaintiff's counsel dated November 19, 2013, indicating that Plaintiff believed there was no need for further briefing, the Court issued an Order Clarifying Order to Show Cause, making clear that the Court expected Plaintiff to brief the issue raised, *i.e.* the Court's authority to opine on the propriety of service at this stage, given that the Norway Action is currently pending before a foreign court. [Docket Entry No. 7 at 2].  The Order to Show Cause required Plaintiff to serve Defendants with a copy of the Order, and any previous submissions, and granted Defendants ten days to file any response with the Court.  [Docket Entry No. 4 at 2].  Plaintiff submitted the Supplemental Brief on November 25, 2013.  Plaintiff also confirmed that Defendants were served with a copy of the Order to Show Cause on November 22,

2013, and a copy of the Supplemental Brief on November 26, 2013.  [Docket Entry No. 11, 12].
Defendants have not submitted any pleadings in response.

II.     Plaintiff's Arguments

The Complaint contains Plaintiff's initial arguments, and is supported by the Ostgard and
George Affirmations.  Geir Ostgard states that he is a Norwegian attorney who represents Plaintiff
in the Norway Action.  He spends a good portion of this affirmation denigrating the Norwegian
legal system, describing it as "not sufficiently evolved" and "with no obvious competence to
comprehend the issues at bar."  Ostgard Affirmation ¶ 1.  Without any support, Ostgard insists that
the Norwegian Court will recognize the American order, and at the very least "will void the
processes and compel Defendants/Respondents to reinitiate their action *de novo*."  *Id.* ¶ 14.  Ostgard
states that if this Court issues the requested relief "the Norwegian judicial system taken at a level
higher than this trial court <u>will</u>, at the least under the principles of comity order the recognition of"
that ruling.  *Id.* ¶ 14 (emphasis in original).  Ostgard also attacks the impartiality of the Norwegian
magistrate.  *Id.* ¶ 18-21.  Ostgard's affirmation is not limited to the issue raised in the Complaint,
*i.e.* the sufficiency of service, but also raises questions concerning whether the right party has been
named in the Norway Action and whether the Norwegian court has *in personam* jurisdiction over
Plaintiff.  *Id.* ¶¶ 15-17.

William George, on the other hand, presents himself as an American attorney.  George
asserts that he is licensed to practice "in the Federal Courts of the United States of America," George
Affirmation at p. 20, but there is no indication of the jurisdictions to which he is admitted.  The
George Affirmation takes the tone of an expert opinion and presumes to offer a legal opinion as to

the merits of the Complaint, based upon what George characterizes as his "experience in International Dispute Resolutions, both as they relate to existing International Conventions . . . and in my capacities as attorney and arbitrator in matters involving International Arbitration." *Id.* at p. 20.  George indicates that he was asked to review the file and "answer certain questions of American law" regarding the service on Plaintiff.  *Id.* at pp. 20-21.

While at times incomprehensible, the gist of the George Affirmation is that the complaint in the Norway Action should be, or has already been, dismissed for various reasons, including that the wrong party was named and served, the complaint was not served within six months, and various exhibits are missing from the copy of the complaint served on Plaintiff.  *See generally id.* at 23.  Without any legal citation, George concludes that "US courts are solely competent to determine the sufficiency of service." *Id.* at p. 23 (emphasis in original).  He then goes on to say, again with no more support than a general reference to "US, International Law, and Hague Convention dispositions," that "there are no alternatives to the dismissal of the" Norway Action.  *Id.* at p. 24 (emphasis in original).[3]

In its various submissions, Plaintiff alleges that the court in the Norway Action refused to entertain arguments akin to those presented here.  Ostgard Affirmation ¶¶ 4, 6; Compl. § VI ¶ 2 (citing the Ostgard Affirmation); *Id.* § VII ¶ 5 (same).  In addition, Plaintiff contends that both the foreign judge and Defendants refuse to acknowledge the strictures of the Hague Service

---

[3] The undersigned has disregarded the opinions offered in the George Affirmation for several reasons, not the least of which is that he is offering an opinion as an expert on the ultimate issue before the Court, *see, e.g., Toscano v. Case*, 2013 WL 5333206, at *8 (D.N.J. Sept. 20, 2013), and without any apparent qualifications beyond his own say so.

Convention.  Ostgard Affirmation ¶¶ 7- 9.  Plaintiff claims that it is therefore apparent that the judge in the Norway Action is biased against Plaintiff.  *Id.* ¶¶ 18, 19, 21.

Plaintiff focuses on an interpretation of the requirements and effects of the Hague Service Convention and its interplay with the Declaratory Judgment Act.  *See generally* Pl.'s Br.  According to Plaintiff, the Hague Service Convention requires that foreign process be served upon a central national authority, which may object to service that does not comply with the procedural rules the receiving country has in effect.  *Id.* at 6-7.  Plaintiff states that the Convention is silent as to which nation has jurisdiction to determine the propriety of service when the central authority is deprived of the opportunity to object because foreign process is served directly upon the named defendant, as Plaintiff argues was done here.  *Id.* at 7.

Plaintiff takes the view that under Article 15 of the Hague Service Convention, foreign service is inherently subject to judicial scrutiny.  *Id.* at 8.  Plaintiff describes the Convention as neither expressly prohibiting courts in the country of receipt from adjudicating the validity of service nor barring simultaneous judicial review of the propriety of service.  *Id.* at 8-9.  In light of this silence, a court's analysis necessarily shifts to considering the purposes underlying the Hague Service Convention, including extending process protections to American citizens defending cases overseas and promoting international judicial collaboration.  *Id.* at 9-12 (citing *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280 (3d Cir. 1981)).  Plaintiff contends that the former purpose would be irreparably frustrated if the Hague Service Convention did not invest American courts with the power to quash defective service,  *Id.* at 11-12, and argues that the Declaratory Judgment Act provides a means for the Court to quash the allegedly defective service or to dismiss the Norwegian Action.  *Id.* at 12-14.  Plaintiff acknowledges, however, that should the Court

determine that dismissal of the Norway Action is the appropriate means of redressing Plaintiff's injury, enforcement by the Norwegian court would be discretionary because this Court lacks the inherent ability to dismiss the Norway Action.  *Id.* at 14-15.

III.    Analysis

The foremost question raised by the Complaint is whether Plaintiff can resort to this Court to attack service of process, arguably made pursuant to the Convention, with regard to an action pending in Norway, and, if so, whether this Court has the authority to quash that service or to order the dismissal of the Norway Action.  To answer that question, the Court must look at the underpinnings of federal subject matter jurisdiction and its interplay with the Hague Service Convention and the Declaratory Judgment Act.

Pursuant to Article III, section 2, of the U.S. Constitution, federal courts may only address actual cases and controversies.  Courts enforce this restriction through several doctrines of justiciability, including standing, ripeness, mootness, the political-question doctrine, and a prohibition on the provision of advisory opinions.  *Pittsburgh Mack Sales & Serv. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 190 (3d Cir. 2009).  To invoke the jurisdiction of a given federal court, a plaintiff must plead an actual or imminent injury that would likely be redressed by a favorable decision from the court.  *Burkey v. Marberry*, 556 F.3d 142, 147 (3d Cir. 2009) (relying on *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)).

Underpinning the entire system of federal judicial powers is the concept that a complaint must set forth a valid legal theory that provides the allegedly injured plaintiff with a cause of action.  The federal court must be capable of granting relief that would redress the harm alleged.

7

The decisive question that the Court must therefore answer is whether either the Hague Service Convention or the Declaratory Judgment Act vests Plaintiff with an independent cause of action, *i.e.* whether there is indeed an actual case or controversy asserted in the Complaint that this Court may decide at this stage of the dispute between Plaintiff and Defendants in this case, who are also the plaintiffs in the Norway Action.

        a.   The Hague Service Convention

The Supremacy Clause establishes that a treaty entered into by the United States is given the same effect as any other federal law.  *See* U.S. Const. Art. IV, cl. 2.  Federal courts have jurisdiction under 28 U.S.C. § 1331 to consider cases arising out of treaties.  When violation of an international treaty is alleged, federal courts may only impose those remedies provided for by the treaty.  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 346-57 (2006).  In addition, an individual may only seek to affirmatively enforce a treaty when the treaty provides for a private right of action. *See Bradley v. United States*, Civ. Action No. 03-6211, 2005 WL 1607019, at *6 (D.N.J. July 8, 2005).  "The Supreme Court recognized that, '[e]ven when treaties are self-executing in the sense that they create federal law, the background presumption is that [i]nternational agreements, even those directly benefitting  private persons, generally do not create private rights or provide for a private cause of action in domestic courts.'" *Gross v. German Found. Indus. Initiative*, 549 F.3d 605, 615 (3d Cir. 2008) (quoting *Medellin v. Texas*, 128 S. Ct. 1346, 1357 n.3 (2008)).  When a treaty does not expressly provide for a private cause of action, courts look to the entirety of the treaty to determine whether an intent to create a cause of action may be discerned.  *Gross*, 549 F.3d at 616.

The Hague Service Convention entered into force on February 10, 1969.  20 U.S.T. 361. The Convention revised an earlier covenant that set forth international rules of civil procedure. *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988).  "The revision was intended to provide a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad."  *Id*. at 698.  Federal Rule of Civil Procedure 4(f)(1) instructs litigants to serve foreign parties in accordance with internationally recognized means of service, such as the Hague Service Convention;  the text of the Convention is attached to Rule 4 as an appendix.

The Convention sets forth a procedure by which each signatory nation must establish a central authority to receive foreign requests for service of process.  *Id*. at 698.  "The destination country's Central Authority is then solely responsible for serving the document or for arranging to have it served 'by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory.'"  *Shenouda v. Mehanna*, 203 F.R.D. 166, 170 (D.N.J. 2001) (quoting Article 5 of the Hague Service Convention).  Under Article 4 of the Hague Service Convention, the central authority receiving service is instructed to inform the foreign party if its service failed to comply with the requisite formalities of service.  Articles 15 and 16 of the Hague Service Convention "limit the circumstances in which a default judgment may be entered against a defendant who had to be served abroad and did not appear, and provide some means for relief from such a judgment."  *Volkswagenwerk*, 486 U.S. at 699.

The Hague Service Convention is a "[s]elf-executing [treaty] because it establishes affirmative and judicially enforceable obligations on its own terms without benefit of subsequent implementing legislation . . . ."  *Randolph v. Hendry*, 50 F. Supp. 2d 572, 575 (S.D. W. Va.

9

1999).  It is well established that the Convention and the obligations it sets forth are entirely

procedural.  *See De James v. Magnificence Carriers, Inc.*, 654 F.2d 280, 290 (3d Cir. 1981) ("The

[T]reaty merely provides a method for effecting service to be used by a litigant with the requisite

authority to serve process.").  Plaintiff appears to concede this point.  *See* Pl.'s Br. at 6 (The

Convention "governs the simple mechanics of service.").

The validity of service may be challenged by the receiving central authority.  In addition,

the Hague Service Convention expressly contemplates a situation in which a foreign defendant

fails to appear in response to a summons served overseas and the plaintiff moves for entry of

default judgment.  In that instance, Article 15 requires that the moving party prove that process

was served in compliance with the Hague Service Convention.  Plaintiff highlights that the

Convention is silent as to who may object to non-compliant service that did not pass through the

central authority and where that individual's objections may be heard, Pl.'s Br. at 6-7, and argues

that the purpose of the Hague Service Convention would be best served if the recipient of non-

compliant service could attack the service by initiating a new action in the courts of the nation

where the recipient resides.  *Id.* at 9-12.

As a procedural code, the Hague Service Convention directly benefits defendants by

providing them with the means to assert an affirmative defense in the event that a plaintiff fails to

meet its obligations under the Hague Service Convention, *i.e.* abide by the rules of service.  *See,*

*e.g.*, *Eggear v. Shibusawa Warehouse Co.*, Civ. Action No. 00-4636, 2001 WL 267881 (E.D. Pa.

Mar. 19, 2001) (granting a Fed. R. Civ. P. 12(b)(5) motion because the plaintiff failed to comply

with the Hague Service Convention when serving a Japanese defendant).  The ability to assert an

affirmative defense, however, does not give rise to an independent cause of action and therefore

10

cannot create federal jurisdiction. *See Rivet v. Regions Bank*, 522 U.S. 470, 475 (1998). Thus, although the Hague Service Convention may provide the basis for an affirmative defense, it does not create a private right of action.

The authority cited by Plaintiff is not to the contrary. In those cases, the defendant either challenged service in the *originating* court, *see e.g. Shenouda*, 203 F.R.D. at 169-171, or challenged the validity of service in a foreign dispute as a defense to an action in the United States to enforce a foreign default judgment. *See, e.g.*, *ARCO Elec. Control Ltd. v. CORE Int'l*, 794 F. Supp. 1144 (S.D. Fl. 1992). In not one case cited by Plaintiff does a court of the United States invalidate service made by another court while that action is still pending.

   b.   The Declaratory Judgment Act

Because the Hague Service Convention does not give rise to a private right of action that would establish jurisdiction for this Court to decide the issue, the Court must look next to the Declaratory Judgment Act. Although Plaintiff argues that the Declaratory Judgment Act provides a means for the Court to provide the requested relief, this argument is misplaced. The Declaratory Judgment Act is also entirely procedural and does not create a private right of action where one does not already exist.

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Congress enacted the Declaratory Judgment Act to allow plaintiffs to secure a declaration of their rights where other

remedies might be inappropriate.  *See Coles v. N.J. Dep't of Human Servs.*, Civ. Action No. 13-3987, 2014 WL 2208142, at *10 (D.N.J. May 28, 2014).  As several circuits have recognized, the Declaratory Judgment Act does not create an independent basis for federal jurisdiction.  *See, e.g., Mack Trucks, Inc. v. Int'l Union, UAW*, 856 F.2d 579, 583 n.4 (1988); *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1327-28 (Fed. Cir. 2012); *Chevron Corp. v. Camacho Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012) ("The [Declaratory Judgment Act] is procedural only . . . and does not create an independent cause of action . . . .") (internal citations omitted).  "Rather, its remedy may lie only if the court has jurisdiction from some other source.  . . . The party seeking to establish declaratory jurisdiction bears the burden of demonstrating that an Article III case or controversy exists at the time the claim for declaratory relief is filed."  *Purdue Pharm. Prods., L.P. v. Actavis Elizabeth, LLC*, Civ. Action Nos. 12-53, 13-5003, 2014 WL 1394178, at *3 (D.N.J. Apr. 9, 2014) (internal citations omitted).

Even if a party can establish that a private right of action exists under the Declaratory Judgment Act, the Court has wide discretion as to whether to exercise its authority or not.  *See Basic v. Fitroy*, 949 F.Supp. 1333, 1338 (N.D. Ill. 1996).  If the exercise of such authority would serve no useful purpose, the Court may decline.  *Id.*  The *Basic* decision is instructive.  *Basic* arose after the plaintiff, defendant in an action filed in New Zealand by the defendant in the American action, asked an American court to intervene in the foreign action.  In *Basic*, the court considered a motion to dismiss the complaint, which requested, in part, declarations that the foreign court lacked jurisdiction over the American plaintiff and that the New Zealand action was contrary to American public policy.  *Id.* at 1335.  In denying the request, the *Basic* court succinctly described the plaintiff's application as "an attempt to render null and void a possible

12

future New Zealand judgment, a judgment which may never come to pass." *Id.* at 1337 (internal citations omitted). The court determined that the matter did not present an actual controversy and declined to exercise the discretionary jurisdiction available under the Declaratory Judgment Act. *Id.* at 1338-40.

Five equitable considerations guided the court in declining to exercise discretionary jurisdiction under the Declaratory Judgment Act. *Id.* at 1339. The two preeminent considerations were whether the requested declaratory judgment would settle the controversy and whether the use of a declaratory action would create or increase friction between courts of different jurisdictions. *Id.* at 1339-41. In addition, the court weighed

> whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; . . . whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for res judicata; . . . and . . . whether there is an alternative remedy that is better or more effective.

*Id.* 1339 (internal citations omitted). Applied to the matter at hand, all five factors militate against the exercise of discretionary authority.

### i. The Relief Sought Would Not Settle the Controversy

Plaintiff has alleged that it would be injured if it has to proceed in the Norway Action and has asked this Court to either quash the summons served upon it or to dismiss that action in its entirety. In its Supplemental Brief, Plaintiff argues that if this Court issued an order finding that Defendants had failed to comply with the Hague Service Convention, the court in the Norwegian Action *might* decide to recognize this Court's decision and dismiss the Norway Action. Pl.'s Br.

at 14-15.  Plaintiff's briefing contains no indication that the Norwegian court would take any action if this Court issued the declaratory judgment Plaintiff seeks. [4]

The Third Circuit recently addressed a comparable situation.  In *Roberts v. Mayor & Burgesses of the London Borough of Brent*, 70 Fed. App'x 615 (3d Cir. 2003), the plaintiff sought a declaratory judgment that service of process in a British action had violated the dictates of the Hague Service Convention.  *Id.* at 618.  The request was denied after the trial court found that it lacked subject matter jurisdiction to address the issue and *sua sponte* dismissed the case.  *Id.* at 618-19.  The Third Circuit affirmed because the redressability of the injury alleged depended entirely upon the actions of the British court—"an independent actor not before the court"—and the plaintiff had not shown that the foreign court would abide by the determination of an American court.  *Id.* at 618.  The *Roberts* court determined that the inability to redress the alleged injury deprived the Court of subject matter jurisdiction over the case.  *Id.* at 619.

Plaintiff has conceded that here, as in *Roberts*, enforcement of a judicial declaration would depend entirely on the conduct of the court in the Norway Action, an independent actor not before this Court.  Ultimately, even if this Court were to grant Plaintiff's request and issue a declaratory judgment as to the validity of the service upon Plaintiff, that order would have no effect on the Norway Action unless the Norwegian court decided to give it any weight, something it is not bound to do.  The undersigned therefore concludes that the relief sought would not settle the controversy.

---

[4] Although Ostgard insists that a favorable decision would compel the Norwegian judiciary to recognize and take action consistent with any determination made by this Court, he does so without support.  *See* Ostgard Affirmation ¶ 14.

14

ii.   The Use of a Declaratory Action Would Increase Friction Between the
Federal Courts of the United States and Norway and Would Improperly
Encroach on the Jurisdiction of Norway

In considering whether a declaratory judgment would create friction between courts of

differing jurisdictions, courts are typically concerned with the comity between the federal

judiciary and the various state courts within the United States.   *Basic*, 949 F.Supp. at 1340.  This

consideration is equally applicable when the proposed judgment would affect a matter pending in

a foreign court because of the principle of international comity, which "is the recognition which

one nation allows within its territory to the . . . judicial acts of another nation, having due regard

both to international duty and convenience, and to the rights of its own citizens, or of other

persons who are under the protection of its laws."  *Id.* (internal citations omitted).  International

comity is only withheld when abiding by this principle would prejudice the interests of the

"nation called upon to give it effect."  *Id.* (*quoting Somportex Ltd. v. Philadelphia Chewing Gum

Corp.*, 453 F.2d 435, 440 (3d Cir. 1970)).

The Ostgard Affirmation levels several unsupported and inflammatory accusations against

the Norwegian court system and the judge presiding over the Norway Action.  Specifically,

Ostgard attacks the competency of that judicial system and alleges that the judge overseeing the

Norway Action is incurably biased against Plaintiff.  Ostgard Affirmation ¶¶ 1, 6, 18, 21.  He

concludes that "[o]nly the strong arm of a US Federal Court interpreting its laws will be respected

and such order recognized by [the Norwegian] higher courts."  *Id.* ¶ 13 (emphasis in original).

With this background in mind, Plaintiff asks this Court to intervene in a foreign dispute and guide

that court toward an outcome different from the one it has already reached.  In its essence, the

15

Complaint is a collateral attack on a ruling issued by the judiciary of a foreign sovereign state while the underlying matter is still pending.

Plaintiff's request is offensive to fundamental precepts of international comity.  It is not for this Court to decide the competence or qualifications of a sister nation, especially when the allegations against that sovereign state are wholly unsupported, other than by conclusory affirmations.  The relief Plaintiff seeks is in direct contradiction with the most basic tenet of international comity: respect for sovereign nations and their judicial systems.  By requesting that this Court intervene in the Norway Action, Plaintiff would have this Court unsettle the equality of nations and place itself in a position superior to that of the Norwegian judiciary.

                iii.   The Remaining Considerations Weigh Against Exercising Discretionary Jurisdiction

Even a cursory review of the remaining three factors counsels against the exercise of discretionary jurisdiction.  As discussed in detail *supra*, any order issued by this Court will not serve any useful purpose in clarifying the legal relations at issue because any such order would have no authority over the court in the Norway Action, which has already rejected Plaintiff's procedural arguments.  Furthermore, it appears to the undersigned that the institution of a separate action to challenge jurisdiction is very likely an example of "procedural fencing," as an end-run around the rulings of the Norwegian court.  Finally, Plaintiff has alternative options available, by defending against the Norway Action through trial and appeal if necessary, and possibly with regard to defense of any enforcement action that may follow.

IV.    Conclusion

The undersigned concludes that this Court lacks subject matter jurisdiction to decide the issues presented in the Complaint.  The Hague Service Convention does not provide a private right of action in the event of violation, nor does the Declaratory Judgment Act create an independent cause of action.  Even if it did, the undersigned concludes that it would be inappropriate to exercise that jurisdiction in this case.  Most notably, the relief sought would not resolve the controversy, nor would any ruling be binding on the Norwegian Court, meaning that there is a lack of redressability.  Accordingly, the undersigned respectfully recommends that the Complaint be dismissed in its entirety.

For the reasons set forth above, and for good cause shown,

**IT IS** on this **18<u>th</u>** day of **November, 2014**

**RECOMMENDED** that Plaintiff's Complaint be **DISMISSED** because the Court lacks subject matter jurisdiction.

Pursuant to Local Civil Rule 72.1(c)(2), the parties have fourteen days from the date of this Report and Recommendation to file and serve objections to the proposed findings and recommendations.

**LOIS H. GOODMAN**
**United States Magistrate Judge**

17